**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **JEFFREY MISHKIN, Individually and On Behalf of All Others Similarly Situated,** | |
| **Plaintiff,** | **Case No. _____** |
| **vs.** | |
| **VOLKSWAGEN GROUP OF AMERICA, INC., A NEW JERSEY CORPORATION,** | **CLASS ACTION COMPLAINT** |
| **Defendant.** | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Jeffrey Mishkin ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Volkswagen Group of America, Inc. d/b/a/ Volkswagen of America, Inc. ("Defendant" or "Volkswagen America"), to obtain damages, restitution, and/or injunctive relief for himself and on behalf of the proposed Class as defined herein. Plaintiff makes the following allegations upon information and belief, except as to his own respective actions, the investigation of his counsel, and the facts that are a matter of public record.

## I.    INTRODUCTION

1.    The engines at issue in this lawsuit have been plagued by problems and have been the subject of other class action lawsuits. The defect at issue here causes the engine to burn excess oil and could also result in engine failure, an undeniable safety defect. Yet, Defendant has failed to inform consumers of the material and significant defect in the 2.0-liter turbocharged engines installed in certain 2012-2017 Volkswagen America vehicles (the "Class Vehicles")[1] sold or leased to consumers nationwide, including Plaintiff.

2.    The 2.0-liter turbocharged engines (the "Engines") common to and equipped in all of the Class Vehicles are plagued by a defect in the design, manufacture, and/or workmanship of the piston rings and/or pistons/piston heads that prevents the piston rings from sitting properly in the grooves of the piston head in the Engines (the "Piston Defect" or the "Defect").

3.    The Piston Defect can cause the pistons and the engine itself to fail at any time. It can also cause the engine to consume an excessive amount of oil, because the combustion chamber is not properly sealed off from the parts of the engine that require engine oil for lubrication. The

---

[1] The Class Vehicles are any 2012 through 2017 model year Audi vehicles equipped with a 2.0-liter turbocharged engine. These vehicles include the following Audi models: TT, A3, A4, A5, A6, Q3, and Q5.

Piston Defect also results in the shrapnel of the fragments of the piston rings and/or minute pieces of the piston head circulating throughout the engine, damaging other engine components. For example, cylinder scoring is a frequent result of the Piston Defect. As a result of the Piston Defect, Plaintiff and Class Members incur out of pocket costs to repair or replace the damaged engine parts or their entire engine. A replacement of the piston rings and/or pistons costs thousands of dollars, and the cost for replacing an Engine is well over $10,000.

4.     The Piston Defect common to all Class Vehicles is a clear safety hazard that was never disclosed to any member of the Class prior to purchase. The Piston Defect in the 2.0T Engine presents a safety risk for Plaintiff and Class Members, because when a piston or pistons suddenly and unexpectedly fail, the Class Vehicles immediately lose engine power. The severity of the safety risk is self-evident:  a sudden loss of power can prevent the driver from accelerating or maintaining speed, controlling the steering wheel or engaging the brakes, all of which drastically increase the risk of collisions.

5.     The Piston Defect also causes substantial damage, because when the Defect manifests, in addition to damaging or destroying critical engine components, it causes further damage throughout the Class Vehicles' powertrain as damaged piston fragments are circulating throughout the engine and fuel system.

6.     Defendant has had actual knowledge of the Defect since at least early 2012. Defendant knew or should have known of the Defect from far earlier due to pre-production testing, failure mode analysis, and reports to authorized dealers and repair centers. Nevertheless, Defendant chose to omit information about the Piston Defect and failed to disclose these problems to Plaintiff and the Class, so that Defendant could continue to profit from the sale and lease of the Class Vehicles.

7.      Despite its knowledge, Defendant omitted information regarding the Piston Defect from all advertising, promotion, or other contacts with Plaintiff and Class members prior to purchase. As a result of Defendant's knowing failure to disclose the Piston Defect to consumers and by failing to correct the problem, Plaintiff and the Class purchased and leased vehicles of a lesser standard, grade and quality represented; that do not meet ordinary and reasonable consumer expectations regarding the quality, durability, or value of the Class Vehicles; and are unfit for their intended purpose. Moreover, the Piston Defect seriously endangers drivers, passengers, and the general public.

8.      Plaintiff Mishkin brings this action on behalf of himself and all those similarly situated ("Class," "Class Members," "Consumers," "Owners") for Defendant's deceptive trade practices in violation of the consumer protection laws of Missouri.  Plaintiff seeks damages, attorney's fees and costs, punitive damages, and the repair of, replacement of, or refund of money paid to own or lease all Class Vehicles, and any other legal relief available for his claims. Should Plaintiff's demanded legal relief be unavailable or prove insufficient, Plaintiff seeks appropriate equitable and injunctive relief in the alternative pursuant to Fed. R. Civ. P. 8(a)(3).

## II.    **PARTIES**

9.      Plaintiff Jeffrey Mishkin is a citizen of the state of Missouri, residing in St. Louis. Plaintiff Mishkin purchased a used 2013 Audi Q5 2.0T from a dealer in St. Peters, Missouri on April 14, 2017.  Since the purchase of the vehicle, it has burned excess engine oil, and an Audi service manager has recently recommended that the pistons need to be replaced.

10.     Defendant Volkswagen America is an entity incorporated in New Jersey with its principal place of business and headquarters at 220 Ferdinand Porsche Drive, Herndon, Virginia 20171. At this location, Volkswagen America coordinates the United States operations and

activities of the Volkswagen, Volkswagen America, Bentley, Bugatti, and Lamborghini brands, as well as the activities of its 8,000 employees and its subsidiary, Volkswagen America Credit, Inc. One of Volkswagen America's fictious names is Volkswagen of America, Inc., which it has registered with the Virginia Secretary of State.

11.    Defendant Volkswagen America imported, distributed, sold, marketed, serviced and/or warranted the Class Vehicles through its network of authorized dealerships in the United States, directly or indirectly, to Plaintiff and Class Members with the understanding and expectation that Class Vehicles would be sold, operated, and fit for their intended purpose across the country, including in Missouri.

12.    In order to sell vehicles to the general public, Volkswagen America enters into agreements with authorized dealerships who engage in retail sales with consumers. In return for the exclusive right to sell new Volkswagen and/or Volkswagen America-branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties Volkswagen America provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to Volkswagen America, Volkswagen America AG, and Volkswagen AmericaAG instructions, issued through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents. Per the agreements between Volkswagen America and the authorized dealers, consumers are able to receive services under Volkswagen America's issued warranty at dealer locations that are convenient to them. These agreements provide Volkswagen America with a significant amount of control over the actions of the authorized dealerships, of which there are nearly 1,000 in the United States.

13.    Volkswagen America also developed and disseminated the owner's manual and

warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Volkswagen America is also responsible for the content of the Monroney Stickers on Volkswagen and Volkswagen America-branded vehicles.

## III.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § l332(d)(2) because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which the Class Members and Defendant are citizens of different states.

15.    This Court has general and specific jurisdiction over Defendant because Defendant has sufficient minimum contacts with Missouri and within the Eastern District of Missouri to establish its presence in Missouri, and certain material acts upon which this suit is based occurred in the District of Missouri, including but not limited to the distribution of Defendant's defective product which was ultimately sold to and used by Plaintiff.

16.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because Defendant does substantial business throughout this District and is subject to personal jurisdiction in this District.

## IV.    FACTUAL BACKGROUND

### A.    PLAINTIFF MISHKIN PURCHASED A DEFECTIVE CLASS VEHICLE AND EXPERIENCED THE PISTON DEFECT

17.    Plaintiff Mishkin purchased his used 2013 Audi Q5 2.0T on April 14, 2017 and has operated the vehicle since that time.

18.    Plaintiff Mishkin's Audi Q5 has had a long history of burning excessive engine oil, and Plaintiff has repeatedly taken the vehicle in for service related to the problem.  On at least three separate occasions, service departments at Missouri dealerships, including certified Audi

dealerships, have performed service to attempt to remedy the problem, all of which have proved unsuccessful.

19.    Plaintiff took the vehicle to Bob's Transmission and Automotive Service in Maryland Heights, Missouri on or about September 9, 2021 to check the oil consumption problem. The service department ran extensive testing on the vehicle, performed certain diagnostics and made several engine cylinder repairs.  Plaintiff's vehicle continued to burn oil.

20.    Plaintiff took the vehicle to RPM Car Care, Inc. in Brentwood, Missouri on or about September 28, 2021 for service related to the oil consumption problem.  The service department ran extensive testing on the vehicle, performed certain diagnostics and made several engine cylinder repairs.  Plaintiff was informed that the oil consumption issue was due to a scoring issue that affected the piston rings.

21.    Plaintiff took the vehicle to Plaza Audi, a certified Audi dealership, in Creve Coeur, Missouri on or about October 28, 2021 for service related to the oil consumption problem.  The service department ran extensive testing on the vehicle and performed certain diagnostics.  Plaza Audi recommended replacement of the engine pistons, with an estimate of over $9,342.10 to perform the repair.

22.    Through its dealer agreements and other methods, Defendant Volkswagen America has control over the documentation and disclosures provided to consumers, such as window stickers and other legally required notices.

23.    Defendant failed to disclose that the Class Vehicles suffer from the Piston Defect which could result in excess engine oil usage and potential engine failure and omitted the existence of the Piston Defect from the materials provided to the general public and consumers of the Class Vehicles.  As a result of Defendant's omissions, at the time that Plaintiff purchased his vehicle, he

believed that his Class Vehicle was safe and reliable.

24.    Prior to purchase, Plaintiff reviewed all paperwork provided by Volkswagen America and the dealership, including warranty materials, and advertising and promotional materials. However, prior to the sale and despite Defendant's knowledge of the defect, Volkswagen America did not disclose the Piston Defect.  None of the information provided to Plaintiff at the time of purchase of his Class Vehicle informed him of the presence of the Piston Defect. Because of Defendant's omissions at the time of purchase Plaintiff was not aware and was not informed that his Class Vehicle suffered from the Piston Defect.

25.    Volkswagen America's omissions were material to Plaintiff. Had Volkswagen America disclosed its knowledge of the Piston Defect before Plaintiff purchased his vehicle -- including in or on any media including internet sites and ads, television ads, the Monroney sticker or through dealership personnel, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Piston Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

26.    Defendant acted in bad faith because Defendant knew, at the time that it designed, tested, validated, marketed, sold and provided written warranties for the Class Vehicles to consumers that the Class Vehicles have the Piston Defect. Notwithstanding that knowledge, Defendant purposefully concealed and omitted the existence of the Piston Defect within the written warranties and elsewhere. Thus, any durational limits in its warranties are unconscionable and unenforceable.

27.    Plaintiff relied on the materials referenced above, and the omissions of Volkswagen America's agents, in that he reasonably expected that Defendant would disclose the existence of a dangerous defect like the Piston Defect to consumers.

28.     At no point prior to Plaintiff's purchase of his Class Vehicle did Defendant disclose that any Class Vehicle suffered from the Piston Defect, notwithstanding that Defendant knew or should have known of the Piston Defect prior to the date of Plaintiff's purchase of his Class Vehicle.  Volkswagen America should have disclosed that the Class Vehicles, including Plaintiff's vehicle, were dangerous because they were prone to burning excess engine oil, which may lead to partial or total engine failure,  in its advertisements and promotional materials.

29.     Had Plaintiff or any other reasonable person known that the Class Vehicles suffered from the Piston Defect, he would not have purchased a Class Vehicle or would have paid less to do so.

**B.      DEFENDANT KNEW OF THE PISTON DEFECT BUT MISREPRESENTED AND/OR CONCEALED ITS EXISTENCE**

30.     In internal combustion engines, pistons are solid cylinders of metal, moving up and down in a hollow cylinder in the engine block.  Each piston is contained within its own individual cylinder. The piston itself is slightly smaller than the hollow cylinder it moves in, but piston rings attached at the piston head make the piston air tight. The piston is attached via a wrist pin to a connecting rod, which in turn is connected to the crankshaft, and together they turn the up and down (reciprocating) motion into round and round (rotational) motion to drive the wheels.  In other words, a piston's purpose is to transfer force from expanding gas in the cylinder to the crankshaft via a piston rod and/or connecting rod. In most, if not all, mass produced car engines, the intake, compression, combustion and exhaust process take place above the piston in the cylinder head, which forces the piston to move up and down within the cylinder, thereby causing the crankshaft to turn. Normal engine operation subjects all pistons to tremendous forces and heat.

31.     In the Class Vehicles' 2.0T Engines, the pistons and/or piston heads are defective in that they cause excessive oil consumption and crack, fracture, or splinter at their point of contact.

The damage to the pistons causes immediate loss of compression within the engine cylinder and causes piston fragments to circulate throughout the fuel system of the Class Vehicles. These failures often occur before the engine reaches 75,000 miles, resulting in a lifespan well short of the class members' expectations and the industry standard for similar engines.

32.    The Piston Defect is inherent in each Class Vehicle and was present at the time of sale.

33.    For years, Volkswagen America has designed, manufactured, distributed, sold, and leased the Class Vehicles. Volkswagen America has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in Missouri and nationwide. Volkswagen America warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

34.    The 2.0T Engine is a four-cylinder turbocharged engine, designated as the second generation EA888 by Volkswagen America. In production since 2008, the 2.0T Engine was different from the first generation EA888 in that it had low-friction thin piston rings and newly designed pistons.

35.    As with most internal combustion engines, the piston slides into the cylinder bore of an engine block, transferring the force from expanding gas in the cylinder to the crankshaft via the crankpin. Pistons, such as the ones in the 2.0T engine, are cast aluminum alloy pieces which conduct and transfer heat. Because aluminum expands when heated, both the piston and the cylinder bore must be manufactured precisely so that the piston can move freely without allowing the force of the combusting gas to escape.

36.    The piston head is the top of the piston, closest to the cylinder head. Piston rings, which are settled into the piston grooves, seal the combustion chamber, transfer heat to the cylinder

wall, and control oil consumption. As with the piston itself, the piston rings must be manufactured to precise specifications, so that they can provide a radial fit between the cylinder wall and the piston.

37.    The Class Vehicles contain one or more design, manufacturing, and/or workmanship defects, including but not limited to defects wherein the pistons, piston rings, and/or piston heads cause the piston rings to fail to seal properly.

38.    As a result, these components cannot withstand the heat and pressure of the engine and crack, fracture, or splinter. One result of the Piston Defect is that the engine can consume excessive amounts of oil. Furthermore, the damage to the piston causes immediate loss of compression within the engine cylinder and causes the remnants of the piston to circulate throughout the fuel system of the Class Vehicles, damaging other engine components.

39.    Volkswagen America acquired its knowledge of the Piston Defect within the 2.0T Engine through sources not available to Plaintiff or Class Members, including but not limited to pre-release testing data, early consumer complaints about the Piston Defect to Volkswagen America and its dealers about the Class Vehicles as well as other earlier model year versions of such vehicles, testing conducted in response to those complaints, aggregate data from Volkswagen America's dealers, aggregate sales data of replacement piston rings, pistons, and engines, and from other internal sources.

40.    The 2.0T Engine, since its widespread release by Volkswagen America in 2009, has proven to be nothing but problematic. Since its release, the 2.0T Engine has been subject to many complaints, including but not limited to excessive oil consumption and defective timing chains, both of which resulted in Volkswagen America agreeing to extend its warranty for timing chain systems and reimburse persons affects by such defect.  Presently, the 2.0T Engine in the

Class Vehicles has caused Volkswagen America to become aware of the Piston Defect through many customers' complaints of loss of compression within an engine cylinder, metal shavings within the fuel system, and/or other forms of engine failure. All of these failures or sequelae of failures ultimately cause the catastrophic failure of the 2.0T Engine, the many of them before 75,000 miles. As such, many customers have had to completely replace their engines prematurely.

41.     Specifically, the 2.0T Engine's pistons/piston heads were defectively designed and/or manufactured to operate within the pressures and temperatures of the oil and fuel system, which in turn causes the piston rings and/or piston heads to crack, splinter, shatter, fracture, and/or break off into pieces within the engine cylinder. In turn, this causes loss of compression in one or more cylinders, triggering a "check engine light" for cylinder misfire due to loss of engine performance. Additionally, the pistons' constant engagement to tremendous forces and heat during normal engine operation will cause the piston head and/or piston rings to become faulty or fail, leading to excessive oil consumption, engine knock and/or pre-ignition, which can lead to undesirable pressure within the engine resulting in poor performance and engine damage, and oftentimes catastrophic damage.

42.     As discussed above, when a piston or piston suddenly and unexpectedly fail, the Class Vehicles immediately lose partial or total engine power. When a vehicle loses partial engine power, it prevents the driver from accelerating or maintaining speed. If a vehicle loses total engine power, it will stall, prevent the driver from being able to adequately control the steering wheel and/or engaging the brakes properly. All of these situations drastically increase the risk of collisions, particularly at intersections and on highways.

43.     Volkswagen America undertook affirmative measures to conceal the Piston Defect through, among other things, a Technical Service Bulletin ("TSB") that Volkswagen America issued to its authorized repair facilities (but not to the Class members themselves).

44.     Volkswagen America was sufficiently aware of the Piston Defect from: pre-production testing; design failure mode analysis; aggregate purchases of replacement piston rings, pistons, and engines; calls to its customer service hotline; and customer complaints made directly to its agent dealers. However, this knowledge and information was exclusively in the possession of Volkswagen America and its network of dealers who are Defendant's agents for repairs and, therefore, unavailable to consumers.

45.     Since 2012, Volkswagen America has designed, manufactured, distributed, sold, and leased the Class Vehicles. Because Volkswagen America has been making the 2.0T engine since 2008, Volkswagen America was acutely aware of the 2.0T engine's defective pistons and piston rings that caused oil consumption well before the Class Vehicles were offered for sale on the market.

46.     Volkswagen America had superior and exclusive knowledge of the Piston Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class Members before they purchased or leased the Class Vehicles.

47.     Well before Plaintiff's purchase of his vehicle, Volkswagen America knew about the Piston Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Volkswagen America and its dealers, testing conducted in response to those consumer complaints, high failure rates of the pistons within the 2.0T Engine, the data demonstrating the inordinately high volume of replacement part sales, and other aggregate data from Volkswagen America dealers about the problem.

48. Volkswagen America is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Volkswagen America conducts tests, including pre-sale durability testing, on incoming components, including the pistons, to verify the parts are free from defect and align with Volkswagen America's specifications. Thus, Volkswagen America knew or should have known the pistons within the 2.0T Engine were defective and prone to put drivers in a dangerous position due to the inherent risk of the Piston Defect.

49. Specifically, Volkswagen America's preproduction testing includes extensive road testing at its proving grounds in Ehra-Lessien, Germany. There, testing includes materials testing for engine components and Volkswagen America is known to be spend more for research and development than any other major vehicle manufacturer in the world and produces far more pre-production vehicles.8 In fact, Volkswagen America even mistakenly sold nearly 7,000 pre-production models, which were meant to be destroyed, to consumers. The pre-production testing on the 2.0T engines revealed the Defect to Volkswagen America.

50. Additionally, Defendant should have learned of the widespread Defect from the sheer number of reports received from dealerships. Volkswagen America's customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the Piston Defect, which led to the release of the Technical Tips for its pre-2012 2.0T Engine. Volkswagen America's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

51. Volkswagen America's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Volkswagen America's

policy that when a repair is made under warranty the dealership must provide Volkswagen America with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendant, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed. As a result of analyzing the requests for warranty repairs, Defendant would have learned about the ongoing nature of the Piston Defect.

52.     Federal law requires automakers like Volkswagen America to be in close contact with National Highway Traffic Safety Administration ("NHTSA") regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

53.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id*. Thus, Volkswagen America knew or should have known of the many complaints about the Piston Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Volkswagen America to the Piston Defect in its 2.0T Engines as early as 2012.

54.     With respect solely to the Class Vehicles, the foregoing excerpts of owner incident reports are but a few examples of the many complaints concerning the Piston Defect which are available through NHTSA's website, www.NHTSA.gov. Many of the complaints reveal that

Volkswagen America, through its network of dealers and repair technicians, had been made aware of the Piston Defect. In addition, the complaints indicate that despite having knowledge of the Piston Defect and even armed with knowledge of the exact vehicles affected, Volkswagen America often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty. When Volkswagen America did attempt repairs, it merely replaced the defective pistons with similarly defective pistons.

55.    On October 16, 2013, Volkswagen America issued a Technical Service Bulletin entitled "Engine oil consumption too high" to address the piston issues in its 2.0T engines. In the TSB, which applied to the 2.0T-equipped Audi A4, A5, and Q5 of various model years between 2009 and 2011, Volkswagen America admitted that its customers were complaining of "excessive engine oil consumption," and directed its dealerships to replace the 2.0T engine's crankcase pressure regulating valve and front crankshaft seal in response. A copy of this TSB is attached as Exhibit 1.

56.    On September 5, 2013, Volkswagen America issued a revised TSB for all of its vehicles, adding the model years 2012 through 2014. This TSB cautioned dealer technicians to clean "metal debris resulting from the mechanical problem" out of the intake manifold and other areas when installing a replacement engine. Notably, the TSB stated that "[e]ngine damage caused by failure to clean debris from assemblies that are transferred to a replacement engine is not covered by Warranty." A copy of this TSB is attached as Exhibit 2.

57.    A significant portion of Volkswagen America's technical instructions to dealerships are only available on proprietary Volkswagen America software and systems. Dealership technicians are instructed by Volkswagen America-given trainings how to use this software, which provides guided, step-by-step instructions on diagnosing, repairing, and

communicating with consumers about problems with their vehicles. Technicians at Audi authorized dealerships are also routinely instructed to open TAC cases with Volkswagen America regarding certain repairs and to follow the instructions given by Volkswagen America. As a result, discovery will show that that Volkswagen America has hundreds, if not thousands of TAC cases in its records showing consumer and dealer complaints about piston ring and/or piston failure, and that Volkswagen America has instructed dealerships to replace the piston rings, the pistons, and even the engine block itself as a result of those failures.

58.    The existence of the Piston Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiff and other Class Members known of the Piston Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

59.    Reasonable consumers, like Plaintiff, expect that a vehicle's engine is safe, will function in a manner that will not pose a safety risk, and is free from defects. Plaintiff and Class Members further reasonably expect that Volkswagen America will not sell or lease vehicles with known safety defects, such as the Piston Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Volkswagen America to conceal and fail to disclose the Piston Defect to them, and to then continually deny its existence.

60.    Despite its knowledge of the Piston Defect in the Class Vehicles, Volkswagen America actively concealed the existence and nature of the defect from Plaintiff and Class Members. Specifically, Volkswagen America failed to disclose or actively concealed at and after the time of purchase, lease, or repair: (a) any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the pistons within the 2.0T Engine; (b) that the Class Vehicles, including the pistons, were not in good in working order,

were defective, and were not fit for their intended purposes; and (c) that the Class Vehicles and the pistons were defective, despite the fact that Volkswagen America learned of such defects as early as early 2012.

61.    When consumers present their Class Vehicles to an authorized Volkswagen America dealer for piston related repairs, rather than repair the problem under warranty, Volkswagen America dealers choose to inform consumers that their vehicles are functioning properly, conduct repairs that merely mask the Piston Defect, or fail to provide service stating that such damage is not covered under warranty. In this manner, Volkswagen America avoids paying for warranty repairs and unlawfully transfers the cost of the Piston Defect to Plaintiff and other consumers.

62.    In particular, Volkswagen America has periodically issued other communications to its dealerships reminding them that the two-step oil consumption test is necessary even when a customer comes in with proof of oil consumption. Volkswagen America reminds its technicians to tell consumers, "all internal combustion engines consume a certain amount of oil," and certain vehicles "consume more oil during the break-in period."

63.    However, some technicians do acknowledge that the Piston Defect exists, as experienced by certain Plaintiff. They say it is a "known defect." Despite this, Volkswagen America has not issued any communications to Class Members acknowledging the Piston Defect, continuing to allow vehicles with a known safety risk to remain on the road.

64.    Further, rather than issue a TSB that specifically addresses the failures of the piston rings and/or pistons, a copy of which Volkswagen America is required to file with NHTSA, Volkswagen America has instead kept information regarding the Piston Defect in its proprietary Offboard Diagnostic Information System ("ODIS"). ODIS, as well as other proprietary software,

provides dealership technicians with guided, step-by-step instructions on diagnosis and repair. These systems contain information about the Piston Defect, or otherwise inform technicians to contact Volkswagen America directly via TAC cases, at which time Volkswagen America informs technicians to check for piston failure and resultant engine damage, and if found, replace the pistons and/or the engine blocks. ODIS and the other proprietary systems are not accessible to Plaintiff or the general public. Moreover, when consumers call Volkswagen America's customer service hotline directly, Volkswagen America's response is only to direct them to take their vehicles to an authorized dealership for diagnosis.

65.    Volkswagen America has caused Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' pistons and/or related components, despite Volkswagen America's knowledge of the Piston Defect.

66.    In order to sell vehicles to the general public, Volkswagen America enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiff. In return for the exclusive right to sell new, Volkswagen America or Audi-branded vehicles, the authorized dealerships are also permitted under these agreements with Volkswagen America to service and repair these vehicles under the warranties Volkswagen America provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, Volkswagen America's authorized dealerships are Volkswagen America's agents, and the consumers who purchase or lease Volkswagen America vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Volkswagen America vehicles locally. Because Plaintiff and members of the Class are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries

to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty.

67.     Further, Plaintiff and each of the members of the Class are the intended beneficiaries of Volkswagen America's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Volkswagen America. Volkswagen America's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Volkswagen America's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

68.     Volkswagen America issued the express warranty to the Plaintiff and the Class members. Volkswagen America also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Volkswagen America also is responsible for the content of the Monroney Stickers on Audi-branded vehicles. Because Volkswagen America issues the express warranty directly to the consumers, the consumers are in direct privity with Volkswagen America with respect to the warranties.

69.     In promoting, selling, and repairing its defective vehicles, Volkswagen America acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Volkswagen America representatives and agents. That the dealers act as Volkswagen America's agents is demonstrated by the following facts: (a) The authorized Audi dealerships complete all service and repair according to Volkswagen America's instructions, which Volkswagen America issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents; (b) Technicians at Audi

dealerships are required to go to at least yearly Volkswagen America-given trainings in order to remain certified to work on Audi-branded vehicles, at which they receive training on Volkswagen America-proprietary systems such as the ODIS which provides guided, step-by-step instructions on diagnosing and repairing Audi-branded vehicles; (c) Consumers are able to receive services under Volkswagen America's issued New Vehicle Limited Warranty only at Volkswagen America's authorized dealerships, and they are able to receive these services because of the agreements between Volkswagen America and the authorized dealers. These agreements provide Volkswagen America with a significant amount of control over the actions of the authorized dealerships; (d) The warranties provided by Volkswagen America for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services; (e) Volkswagen America dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers; (f) Volkswagen America controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, particularly through directed step-by-step ODIS instructions, and the dealerships are able to perform repairs under warranty only with Volkswagen America's authorization. (g) Volkswagen America has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public, particularly the advertising; and (h) Volkswagen America implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Volkswagen America dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

70.     Indeed, Volkswagen America's warranty booklets make it abundantly clear that Volkswagen America's authorized dealerships are its agents for vehicle sales and service. The

booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at their "authorized Audi dealer." For example, the warranty booklets state, "[a]ny authorized Audi dealership in the United States, including its territories, will honor this warranty." Further, the warranty "only applies to vehicles or parts and accessories that are imported or distributed by Audi, and vehicles original sold by an authorized Audi dealer in the United States, including its territories." Under the terms of the warranty repairs will be provided by "[y]our Audi dealer." The booklets direct Plaintiff and Class members, should they have a problem or concern, to "discuss them first with management personnel at your authorized Audi dealership. In the event your dealership does not respond to your satisfaction, Audi offers additional assistance. You may contact the Audi Customer Experience Center via telephone or mail as well as email, chat, Twitter, and Facebook…A Customer Advocate, in conjunction with authorized Audi dealer, will work with you to gather and review all the facts relating to your concern."

71.     Further, Volkswagen America also offers certain "complimentary services," including a pre-delivery inspection and the first maintenance on the vehicle free of charge. Both of these services are actually completed by "your authorized dealer." For example, "[p]rior to delivery, your authorized Audi dealer completed an extensive and detailed inspection of your vehicle." Further, consumers are directed to "contact your authorized Audi dealer to schedule" their complimentary first service.

72.     Further, as noted by Volkswagen America on its website describing the Audi Certified Pre-Owned program, the vehicles are actually inspected and certified by technicians at authorized dealerships. In touting its "300+ Point Dealer Inspection," Volkswagen America states,

"[o]nly once the vehicle passes a detailed dealer inspection does it earn the right to be part of the Audi Certified pre-owned program."

73.     As such, authorized Audi dealerships inspect used vehicles on Volkswagen America's behalf and it is dealer's certification of quality of these vehicles is sufficient under standards published by Volkswagen America that is enough to bind Volkswagen America to the more generous warranty terms of the Certified Pre-Owned Warranty. As stated on the website, "only after this exhaustive dealer inspection are we confident in backing the vehicle with our Audi Certified pre-owned Limited Warranty."

74.     Moreover, the website also states that such vehicles are "rigorously inspected by Audi trained technicians to ensure each Audi Certified pre-owned vehicle is in optimal condition."

75.     Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Volkswagen America. Plaintiff and each of the members of the Class have had sufficient direct dealings with either Volkswagen America or its agent dealerships to establish privity of contract between Volkswagen America, on one hand, and Plaintiff and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiff and Volkswagen America.

76.     Defendant unlawfully failed to disclose the Piston Defect to induce Plaintiff and other Class Members to purchase or lease the Class Vehicles.

77.     Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiff's.

78.     Defendant unlawfully induced Plaintiff and Class members to purchase their respective Class Vehicles by concealing a material fact (the defective pistons within the 2.0T

Engine). Had Plaintiff and Class members known of the subject defect, they would have paid less for the Class Vehicles or would or not have purchased them at all.

79.     Accordingly, Volkswagen America's ill-gotten gains accrued in the form of increased sales and profits resulting from the material omissions that did -- and likely will continue to -- deceive consumers, should be disgorged.

80.     Defendant fraudulently, intentionally, negligently and/or recklessly concealed from Plaintiff and members of the Class the Piston Defect in the Class Vehicles even though Defendant knew or should have known of the Piston Defect in Class Vehicles.

81.     Knowledge and information regarding the Piston Defect was in the exclusive and superior possession of Defendant and its dealers. That information was not provided to Plaintiff and members of the Class. Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to Defendant's network of exclusive dealers, and consumer complaints made online and to the NHTSA, media attention when the Defect manifests, and testing performed in response to consumer complaints, *inter alia*, Defendant was aware (or should have been aware) of the Piston Defect in the Class Vehicles and fraudulently concealed the Defect and safety risk from Plaintiff and members of the Class. Defendant knew, or should have known, that the Piston Defect was material to owners and lessees of the Class Vehicles and was not known or reasonably discoverable by Plaintiff and members of the Class before they purchased or leased Class Vehicles.

82.     The Piston Defect is material because it poses a serious safety concern. As attested by Class Members in numerous complaints to the NHTSA, and other online forums, the Piston Defect can impair any driver's ability to control his or her vehicle and greatly increase the risk of collision.

83.    The Piston Defect is also material because consumers, like Plaintiff, incur significant and unexpected repair costs. Volkswagen America's failure to disclose, at the time of purchase, the pistons' marked tendency to fail is material because no reasonable consumer expects to spend hundreds, if not thousands, of dollars to repair or replace essential engine components expected to last much longer than 75,000 miles of use.

84.    Had Volkswagen America disclosed the Piston Defect, Plaintiff and Class Members would not have purchased the Class Vehicles or would have paid less for them.

85.    Defendant has and continues to be under a legal obligation under federal law to monitor defects that can cause a safety issue and report them within five (5) days of learning of them. Defendant therefore assiduously monitor the NHTSA–ODI website and the complaints filed therein to comply with their reporting obligations under federal law.

86.    Defendant knew that any defect potentially leading to complete engine failure, such as the Piston Defect, presents a serious safety risk.

87.    Notwithstanding Defendant's exclusive and superior knowledge of the Piston Defect, Defendant failed to disclose the Defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell Class Vehicles containing the Defect. Further, Volkswagen America failed to warn consumers and thereby permitted resale of the Class Vehicles at artificially inflated prices in the secondary market. Defendant has intentionally concealed that the Piston Defect may present a safety risk, rather than disclosing the Piston Defect and risk to consumers, including Plaintiff, members of the Class, and the public.

## 1.    CONSUMER COMPLAINTS

88.    The NHTSA provides a system for motor vehicle owners to report complaints relating to safety defects that pose a risk of accidents in vehicles manufactured or imported in the

United States, including safety defects relating to engine malfunctions. The safety defect complaints are entered into the NHTSA consumer complaint automated database, which is accessible to manufacturers and are routinely reviewed by Volkswagen America soon after the submission of each complaint. NHTSA also provides these consumer complaints to the vehicle manufacturers directly, including Volkswagen America. Given the vast majority of owners of Class Vehicles are not aware of NHTSA and/or its reporting system, complaints received by NHTSA form only a small minority of the overall number of complaints which have been made to Volkswagen America directly and/or through its authorized dealerships, including through the form of warranty repairs.

89.    Federal law requires automakers like Volkswagen America to be in close contact with NHTSA regarding potential defects. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000). Accordingly, Volkswagen America monitors NHTSA databases for consumer complaints regarding their automobiles as part of their obligation to identify potential defects in their vehicles, such as the Piston Defect.

90.    From its monitoring of the NHTSA databases, as well as their monitoring of complaints made on internet forums and to certified dealerships, Volkswagen America knew or should have known of the Piston Defect complaints lodged. However, Volkswagen America failed to act on that knowledge by warning Class members.

91.    Defendant knew about the Defect due to consumer complaints made online and internally to their exclusive network of dealers, which Defendant monitors as part of a continuous obligation to identify potential defects in its vehicles.

92.    Defendant's deceptive acts, misrepresentations and/or omissions regarding the Piston Defect create a safety risk for drivers and occupants of the Class Vehicles as well as

members of the public who may be involved in accidents with Class Vehicles that experience the

Piston Defect while driving. The reasonable expectation that the Class Vehicles are safe and

reliable to drive (and ride in) is and was material to Plaintiff and members of the Class at all

relevant times.

93.    Defendant knew about the Piston Defect through monitoring complaints identifying

the Defect, which were posted before Plaintiff purchased or leased his Class Vehicle. The

following constitutes a sampling of complaints concerning consumers' experiences with the Class

Vehicles on the internet, including, but not limited to, postings appearing in online forums, such

as Volkswagen America Chat, regarding the Piston Defect in the Class Vehicles:

- "The dealer recommended piston replacement... just like all the previous model years subject to the lawsuit. We are burning 1.13 quarts every thousand miles. The cost of rthe epair is $6,000.00. The regional network is willing to cover $2K for parts, but no labor. I'm so pissed off. I am still arguing with the regional rep, and as far as I know, Audi Corporate has nothing to say about it. We just finished paying $1,000.00 to replace the A/C blower motor and resistor. This car is turning out to be junk.."[2]

- "Puchased new 2011 Q7 3.0T. Started to notice low engine oil light is on too often when reached 75,000 miles. Took it to Dealer, they confirmed that it is Excessive oil consumption. Dealer reached out to AoA and my car was Denied for fix as it is out of warranty. I have Extended warranty (Fidelity) and they won't cover it neither as it is not mechanical Breakdown. I had numeous email back and forth with AoA,, and Still denied."[3]

- "Audi A4 2012 excessive oil consumption. Dealer did the oil consumption test and piston and rings need to be replaced. Already spent over $1K on new breather crankshaft repairs etc. Did anyone get AoA to pay for new piston and rings? Its a $6K repair that I am unwilling to pay because it should not be doing this crap for such an expensive car."[4]

---

[2] https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/ (posted May 13, 2017) (last visited June 23, 2022)

[3] https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/page6/ (posted May 23, 2017) (last visited June 23, 2022)

[4] https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/ (posted May 22, 2017) (last visited June 23, 2022)

- "I have not had a car use oil since a high mileage 1969 Chevy Impala. I apparently now have one in my Q5!. I was told because I am using synthetic oil, I can go 10000 miles between oil change service. So after the last change, I was getting it every 5000, warning light popped on after about 7500 saying add oil! Tried to get the right oil at several gas stations, and they did not carry the recommended synthetic oil. Did not want to chance voiding a warranty, so took it in for oil change Service told me that the vehicle should use a quart of oil approximately every 7500 miles. I see other model years apparently have had the same problem. Not happy...."[5]

- "Lost compression at only 43,670 miles to fourth cylinder. Engine was rebuilt by Audi dealer. Found pieces of oil control ring from a piston in oil pan, air leaking through intake, seating surface for intake valve number 2 on cylinder 4 was burnt and unable to seat properly due to spring on that valve being weaker than others."[6]

- "Oil consumption is getting worse and worse. Currently, I am adding a quart of oil every 3 days in between regular oil changes. This is a real issue. I just spent 5,000 dollars approx. on a tune up at a foreign car body shop but they could not repair the oil issue. This is now a known issue with Audis. What can be done to help this issue?"[7]

- Car burning excessive oil. The oil light comes on all the time. Oil consumption is not normail. I have to add oil every 1000 miles. From what I hear from other Audi owners to repair the engine it will cost around $6,000.00. The pistons and rings are defective and since there are soooo many complaints, Audi should recall this issue and fix it for all affected vehicles."[8]

- "Audi A4 2012 excessive oil consumption. Dealer did the oil consumption test and piston and rings need to be replaced. Already spent over $1K on new breather crankshaft repairs etc. Did anyone get AoA to pay for new piston and rings? Its a $6K repair that I am unwilling to pay because it should not be doing this crap for such an expensive car."[9]

- "Low oil pressure reading metal fragments in engine cause engine to fail."[10]

- Owned 1 year and just over 120ish miles timing chain jumped required head rebuild and the timing replacement. Soon as those were completed and car back on the road, oil consumption every 150 miles with carbon buildup regularly on the rear bumper.

---

[5] https://www.carcomplaints.com/Audi/Q5/2014/engine/excessive_oil_consumption.shtml (posted Oct. 17, 2015) (last visited June 23, 2022)
[6] https://www.nhtsa.gov/vehicle/2015/AUDI/A3/4%252520DR/AWD (posted April 6, 2018) (last visited June 23, 2022).
[7] https://www.nhtsa.gov/vehicle/2012/AUDI/Q5/SUV/AWD (posted July 18, 2021) (last visited June 23, 2022).
[8] https://www.nhtsa.gov/vehicle/2012/AUDI/Q5/SUV/AWD (posted Dec. 28, 2020) (last visited June 23, 2022).
[9] https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/ (posted May 22, 2017) (last visited June 23, 2022).
[10] https://www.nhtsa.gov/vehicle/2012/AUDI/Q5/SUV/AWD (posted July 5, 2019) (last visited June 23, 2022).

Low oil pressure light soon to appear following up with water pump housing cracking, replaced the water pump and low oil pressure is worse than before this repair. Checked oil pan for sludge, oil pan full of metal, tear down the top end of motor inspection disclosed that both of the balance shafts and sprocket were destroyed teeth missing from gears, assuming that in addition to this that piston rings definitely must be fried so they will be replaced with the balance shafts repair. In addition to this entire engine being a lemon and needing replaced or rebuilt, 2 smaller issues I've had would be wiper motor is not even fast enough for major downpours so possibly needs replacement and also the rear backup camera is extremely difficult for viewing as it's foggy/pixelated/shadowy and during rain completely useless."[11]

## 2.    VOLKSWAGEN AMERICA MONITORED THE ABOVE INFORMATION AND KNEW OF THE EXISTENCE OF THE PISTON DEFECT

94.    As evidenced by, among other things, the complaints submitted to NHTSA and elsewhere, Defendant has been aware of the Piston Defect for years. Further Defendant knew that the Defect poses a serious safety risk to Class Members and the public at large, and the associated costly repair charges to the Class Vehicles.

95.    Defendant monitored and saw the above quoted consumer complaints for three reasons:

    a.    First, pursuant to the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), 49 U.S.C. § 30118, manufacturers are required to monitor reports submitted to NHTSA and report information regarding internal customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects.

---

[11] https://www.nhtsa.gov/vehicle/2012/AUDI/A4/4%252520DR/FWD (posted Dec. 21, 2021) (last visited June 23, 2022)

b.      Second, car manufacturers like Defendant know that NHTSA is a repository for complaints, and as such can provide an early warning mechanism for responding to design or manufacturing defects that pose a safety hazard. Hence, as courts have found, it is entirely reasonable to assume that car manufacturers closely monitor and analyze complaints made online and to NHTSA—particularly when it entails safety hazard.

c.      Third, online reputation management (commonly called "ORM" for short) is now a standard business practice among most major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products. "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation."[12] The growth of the internet and social media and the advent of reputation management companies have led to ORM becoming an integral part of many companies' marketing efforts. Defendant regularly monitored consumer complaints in connection with its ORM activities because candid comments from Volkswagen America owners provide valuable data regarding quality control issues and customer satisfaction.

---

[12]      Moryt Milo, *Great Businesses Lean Forward, Respond Fast*, SILICON VALLEY BUSINESS JOURNAL (September 5, 2013), http://www.bizjournals.com/sanjose/print-edition/2013/05/17/great-businesses-lean-forward-respond.html

96.     Nevertheless, Volkswagen America knowingly, intentionally, and/or recklessly continued to manufacture and sell the Class Vehicles while omitting that its engines are defective and dangerous and without remedying the Piston Defect.

97.     Despite its knowledge relating to the Piston Defect in the Class Vehicle's defective engine and its clear safety implications, Volkswagen America took no action to alert Plaintiff or the Class members of the Piston Defect in the Class Vehicles. Volkswagen America declined to provide notice of the Piston Defect through point-of-sale communications, alerts, direct communications which identified Plaintiff and Class members by state vehicle registry databases, or through print or electronic media. Instead, Volkswagen America omitted mention of and/or concealed the Piston Defect from unwitting consumers who unknowingly purchased and continued to operate the affected Class Vehicles.

### C.     VOLKSWAGEN AMERICA WAS LEGALLY REQUIRED TO DISCLOSE THE PISTON DEFECT AND FAILED TO DO SO

98.     Volkswagen America knew of the Piston Defect but did not disclose it to purchasers/lessees either before or after their transaction. Had Volkswagen America disclosed the Piston Defect, Plaintiff and Class members could have incorporated the information in their purchase/lease decision.

99.     Volkswagen America could have, and should have, disclosed the Piston Defect in its various communications at the point of sale.

100.     The language and delivery methods available to Volkswagen America are not novel.  Volkswagen America could and should have provided Plaintiff and the Class with information notifying them of the existence of the Piston Defect, how the Piston Defect presents itself to the consumer, and the cause of the Piston Defect. Such detailed information is the very

type of information that Plaintiff contend amounts to a material omission and should have been disclosed to Plaintiff and the Class members prior to or at the time of the initial sale of each Class Vehicle. Accordingly, the author (Volkswagen America) and contents of the TSB evidence the who, what, when, where, and why of Volkswagen America's omissions and how such statements could have been provided to each Class Member prior to their purchase of a Class Vehicle.

101.    Furthermore, the Description of Defect contained in documents Volkswagen America submitted to dealers in the form of the TSB was derived from information provided by Volkswagen America or otherwise equally available to Volkswagen America; this summary further evidences the kind of disclosure that should have been made to Plaintiff and consumers prior to purchase.

102.    Volkswagen America had a duty to make such a disclosure and inform Plaintiff and the Class about the safety hazard posed by the Piston Defect, whether through its agents (certified Volkswagen America dealerships subject to its Dealer Agreements), through various communications available at the point of sale, or other means available.

103.    Because Volkswagen America did not warn Plaintiff or Class members of the Piston Defect described herein Class members purchased and/or leased their Class Vehicle unaware of the Piston Defect.  Had Plaintiff known of the Piston Defect, he would not have purchased his Class Vehicle, or certainly would have paid less for it.

104.    To this day, Defendant continue to omit material information concerning the Piston Defect in the Class Vehicles from users, consumers, and the public.  As a result, consumers continue to operate Class Vehicles and continue to experience the Piston Defect, including excessive oil consumption, and are at obvious increased risk for engine failure.

105.    In light of Defendant's knowledge of the problems associated with, and the serious

nature of the Piston Defect at issue, Defendant knew, or should have known, that it was selling the Class Vehicles to consumers with a value that was substantially diminished.

106.    Plaintiff and the Class reasonably expected that the Class Vehicles would not contain a Piston Defect that would substantially impair the Class Vehicles' performance and use. Plaintiff and Class Members also reasonably expected that the Class Vehicles would not require extensive and/or expensive repairs as a result of the Piston Defect (or Defects), which Defects were known to Volkswagen America at the time of sale.

107.    If Defendant had not omitted material information regarding the defective nature of the Class Vehicles, Plaintiff and other members of the Class would not have purchased the Class Vehicles at prices and on the terms offered.

## V.    **FRAUDULENT OMISSION ALLEGATIONS**

108.    Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Volkswagen America responsible for disseminating unfair, deceptive, and misleading marketing materials regarding the Class Vehicles. Defendant are necessarily in possession of all of this information. Plaintiff's claims arise out of Defendant's fraudulent omission of the Piston Defect.

109.    Plaintiff alleges that at all relevant times, including specifically at the time he and Class members purchased his Class Vehicle, Volkswagen America knew, should have known, or was reckless in not knowing of the Piston Defect; Volkswagen America had a duty disclose information material to a consumer, such as the Piston Defect, based upon its exclusive knowledge; but Volkswagen America never disclosed the Piston Defect to Plaintiff, Class members, or the general public other than its halfhearted, inadequate recall of some Class Vehicles.

110.    Plaintiff makes the following allegations as specific as reasonably possible:

a. **Who:** *Volkswagen America* actively omitted the Piston Defect from Plaintiff and Class members at the point of sale or thereafter. Defendant's agents should have and could have disclosed the Piston Defect. As to Plaintiff himself, Volkswagen America should have and could have disclosed the Piston Defect at the time he purchased his vehicle or thereafter.

b. **What:** Volkswagen America knew, should have known, or was reckless in not knowing, that the Class Vehicles contain the Piston Defect. Despite its knowledge, Volkswagen America *failed to disclosed the Piston Defect* at the point of sale or thereafter.

c. **When:** Defendant's omissions began *from the start of the Class period and continue to this day*. Volkswagen America has never taken any action to inform Plaintiff, Class members, or the general public of the true nature of the Piston Defect. As to Plaintiff himself, Defendant has continually omitted the true nature of the Piston Defect for the entirety of the relevant time period, including at the point of sale.

d. **Where:** Volkswagen America's omissions occurred *in every commun*ication Defendant had with Plaintiff, Class members, and the general public. In fact, Volkswagen America's omissions continue to this day. As to Plaintiff himself, Defendant's omissions occurred in every communication it had with him about his vehicle, including all communications that happened before, at the point of and after their purchase of a Class Vehicle.

e.    **How:** Volkswagen America *omitted and failed to disclose* the Piston Defect to Plaintiff, Class members, or the general public at the point of sale or thereafter via a press release, permanent warnings affixed to the vehicles, direct mail campaign, or otherwise.  As to Plaintiff himself, Volkswagen America omitted and failed to disclose the Piston Defect on a Monroney Sticker or any other communication or point of sale document.

f.    **Why:** Due to corporate greed, Volkswagen America omitted the Piston Defect in order to deceive Plaintiff, Class members, and the general public into buying Class Vehicles for a premium value to *maximize its profits*. Furthering its goal to maximize profits, Volkswagen America failed to notify Class members of the true nature of the Piston Defect to avoid an avalanche of warranty claims and expenses related to replacing every engine system in every Class Vehicle.  As to Plaintiff himself, Volkswagen America omitted the Piston Defect in order to deceive him into purchasing a Class Vehicle at a premium price, thereby maximizing Volkswagen America's profits, and avoiding the cost of replacing the engine in his Class Vehicle.

g.    **Causation:** Because Volkswagen America never disclosed the Piston Defect, despite its extensive knowledge, Plaintiff and Class members purchased/leased Class Vehicles that did not or will not safely perform and as such are worth less than one that does safely perform. Had Volkswagen America disclosed the Piston Defect, *Plaintiff and other Class members would not have purchased/leased their Class Vehicle, or certainly would*

*have paid less for it.* Volkswagen America's omissions further *devalue* Plaintiff's and Class members' Class Vehicle and causes him to pay *out-of-pocket* for a true and complete fix for the Piston Defect.

## VI.   TOLLING OF STATUTES OF LIMITATIONS

111.   Defendant was and remains under a continuing duty to disclose to Plaintiff and members of the Class the true character, quality and nature of the Class Vehicles, that the Piston Defect is based on a poor design and/or substandard materials, and that it will require costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles.

112.   As a result of this active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

### A.   DISCOVERY RULE TOLLING

113.   Class Members had no way of knowing about the Piston Defect and the other information concealed by Defendant.

114.   Within the time period of any applicable statutes of limitation, Plaintiff and the Class members could not have discovered through the exercise of reasonable diligence that Defendant were concealing the Piston Defect.

115.   Plaintiff and the Class did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Defendant did not report information within their knowledge to federal authorities (including NHTSA), their dealerships or consumers, nor would a reasonable and diligent investigation have disclosed that Defendant had information in their possession about the existence and dangerousness of the Piston Defect and opted to conceal that information until shortly before this action was filed.

116. All applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.     FRAUDULENT CONCEALMENT TOLLING**

117. All applicable statutes of limitation have also been tolled by Defendant's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

118. Instead of disclosing the Piston Defect and disregard of safety of which it was aware, Defendant falsely represented that Class Vehicles were safe, reliable, and of high quality, and that they were a reputable manufacturer that stood behind the Class Vehicles that were on the road.

**C.     ESTOPPEL**

119. Defendant was under a continuous duty to disclose to Plaintiff and the other Class Members the true character, quality, and nature of the Piston Defect plaguing the Class Vehicles.

120. Defendant knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Piston Defect from consumers.

121. Defendant was also under a continuous duty to disclose to Plaintiff and the Class that the Piston Defect plagued the Class Vehicles, and that the Piston Defect systematically devalued and undermined safety.

122. Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

**VII.     CLASS ACTION ALLEGATION**

123. Plaintiff brings this action as a class action pursuant to Rule 23(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class:

All persons or entities in the state of Missouri who purchased or leased a Class Vehicle.

124.    Excluded from the Class are Defendant, its employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of Defendant, Defendant's Dealers, Class Counsel and their employees, and the judicial officers and their immediate family members and associates court staff assigned to this case.

125.    Numerosity—Fed. R. Civ. P. 23(a)(1).  The Class is comprised of thousands of individuals who were Defendant's customers, the joinder of which in one action would be impracticable.  The exact number or identification of the Class Members is presently unknown. The identity of the Class Members is ascertainable and can be determined based on Defendant's records.

126.    Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3).  The questions of law and fact common to the Class predominates over questions affecting only individual Class Members, and includes, but is not limited to, the following:

(a)   Whether the Class Vehicles have the Piston Defect;

(b)   Whether the Defendant has engaged in unfair and/or deceptive trade practices by failing to disclose the material fact that the Class Vehicles have the Piston Defect;

(c)   Whether Defendant has engaged in unfair and/or deceptive trade practices by selling the Class Vehicles with a Piston Defect;

(d)   Whether Defendant knew or should have known about the Piston Defect in the Class Vehicles before making the Class Vehicles available for purchase and use by Plaintiff and the Class;

(e)   Whether Defendant owed a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the testing, design, production, manufacture, warranting, and marketing of the Class Vehicles;

(f)   Whether Defendant breached its duties to Plaintiff and the Class to exercise reasonable and ordinary care in the testing, design, production, manufacturer,

warranting, and marketing of the Class Vehicles;

(g)  Whether Defendant breached its duties to Plaintiff and the Class by failing to promptly withdraw the Class Vehicles from the marketplace or take other appropriate remedial action;

(h)  Whether the Class Vehicles failed to perform in accordance with the reasonable expectations of ordinary consumers such as Plaintiff and the Class;

(i)  Whether Defendant's Class Vehicles fail to perform as advertised or warranted;

(j)  Whether Plaintiff and the Class are entitled to compensatory and/or actual damages, including but not limited to the cost to repair the Class Vehicles, remove and replace the defective engines, as well as damages from the diminution of value of Class Vehicles;

(k)  Whether Defendant concealed material facts from its communications and disclosures to Plaintiff and the Class regarding the Piston Defect in the Class Vehicles;

(l)  Whether, as a result of Defendant's conduct, Plaintiff and the Class have suffered damages and, if so, the appropriate amount thereof; and

(m) Whether Plaintiff and the Class are entitled to treble damages and/or punitive damages or other relief.

127.  Typicality—Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of those of the Class in that Plaintiff, like all Class Members, purchased a Class Vehicle and is subject to losses resulting from the failure of the Class Vehicles.  Plaintiff has experienced problems with his Class Vehicle consistent with those experienced by Class Members.  Plaintiff has suffered damages in the form of costs to repair his Class Vehicle, as well as the diminution of value of the underlying real property, and such damages are consistent with those suffered by Class Members.

128.  Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1).  Plaintiff is an adequate representative of the Class because he fits within the class definition and his interests do not conflict with the interests of the Members of the Class they seek to represent. Plaintiff is represented by experienced Class Counsel.  Class Counsel have litigated numerous class actions,

and Plaintiff's counsel intend to prosecute this action vigorously for the benefit of the entire Class. Plaintiff and Class Counsel can fairly and adequately protect the interests of all of the Members of the Class.

129.    <u>Superiority—Fed. R. Civ. P. 23(b)(3)</u>.  A class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Plaintiff and members of the Class have suffered irreparable harm as a result of Defendant's bad faith, fraudulent, deceitful, unlawful, and unfair conduct.  Because of the size of the individual Class Members' claims, no Class Member could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendant continue to engage in the bad faith, unlawful, unfair, and deceptive conduct that is the subject of this Complaint, and Defendant would be permitted to retain the proceeds of their violations of law.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

130.    Plaintiff and the Class do not anticipate any difficulty in the management of this litigation.

**VIII.    <u>CLAIMS</u>**

**COUNT I**
**VIOLATIONS OF MISSOURI'S MERCHANDISING PRACTICES ACT**
**RSMO § 407.020 ET SEQ.**

1.  Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2.    Plaintiff brings this claim on behalf of himself and the Missouri Class against Defendant.

3.    Defendant, Plaintiff, and members of the Missouri Class are "persons" within the meaning of the Missouri Merchandising Practices Act ("MMPA"), RSMo § 407.020 et seq.

4.    The Missouri MMPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." RSMo § 407.020.

5.    In the course of its business, Defendant violated the Missouri MMPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

6.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the Piston Defect, Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by the Missouri MMPA.

7.    Defendant's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Missouri Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

8.    Defendant's scheme and concealment of the Piston Defect and true characteristics of the engines in the Class Vehicles were material to Plaintiff and Missouri Class members, as the

Defendant intended. Had they known the truth, Plaintiff and Missouri Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

9.      Plaintiff and Missouri Class members had no way of discerning that Defendant's representations were false and misleading and/or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and Missouri Class members did not, and could not, unravel Defendant's deception on their own.

10.     Defendant had an ongoing duty to Plaintiff and Missouri Class members to refrain from unfair or deceptive practices under the Missouri MMPA in the course of its business. Specifically, Defendant owed Plaintiff and Missouri Class members a duty to disclose all the material facts concerning the Piston Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Missouri Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

11.     Defendant's violations present a continuing risk to Plaintiff and Missouri Class members, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

12.     As a direct and proximate result of Defendant's violations of the Missouri MMPA, Plaintiff and the Missouri Class have suffered injury-in-fact and/or actual damage.

13.     Plaintiff and the Missouri Class seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Missouri MMPA per RSM § 407.020.

## COUNT II
## FRAUD BY CONCEALMENT OR OMISSION

14.     Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

15.     Plaintiff brings this claim on behalf of himself and the Class under the common law of fraudulent concealment.   Defendant are liable for both fraudulent concealment and non-disclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

16.     Defendant intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Piston Defect with the intent to mislead Plaintiff and Class members. Defendant knew, or should have known, that the engine was defective in its design and that the manufacturer's warranties were manipulated in such a manner so that Defendant could avoid for the costs of repair and/or replacement. Defendant also knew, or should have known, that the Piston Defect in the Class Vehicles can cause complete engine failure. Further, Defendant knew, or should have known, that such failure would place vehicle operators, passengers and the general public at risk for serious injury.

17.     A reasonable consumer would not have expected that the Class Vehicles contain a defective engine that could cause engine failure and significantly increase the risk death and/or injury to operators, passengers, and the general public. Defendant knew that reasonable consumers expect that their vehicle has a fully functional engine, and would rely on those facts in deciding whether to purchase, lease, or retain a new or used motor vehicle. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

18.     Defendant ensured that Plaintiff and the Class did not discover this information through actively concealing it and misrepresenting the Class Vehicles' engines without disclosing

the truth. Defendant intended for Plaintiff and the Class to rely on their omissions—which they did by purchasing and leasing the Class Vehicles at the prices they paid.

19.    Defendant had a duty to disclose the Piston Defect because:

a.    Defendant had exclusive and/or far superior knowledge and access to the facts about this hidden and complex safety Defect. Defendant also knew that these technical facts were not known to or reasonably discoverable by Plaintiff and the Class;

b.    Defendant knew the Piston Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class members' decisions to buy or lease Class Vehicles;

c.    Defendant is subject to statutory duties to disclose known safety Defects to consumers and NHTSA; and

d.    Defendant made incomplete representations about the safety and reliability of the Class Vehicles and their engines, while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendant intentionally concealed, suppressed, and failed to disclose to Plaintiff and the Class that the Class Vehicles contained the dangerous Piston Defect. Because they volunteered to provide information about the Class Vehicles that they offered for sale to Plaintiff and the Class, Defendant had the duty to disclose the whole truth. It did not.

20.    To this day, Defendant has not made full and adequate disclosure, continue to defraud Plaintiff and the Class, and continue to conceal material information regarding the Piston

Defect. Indeed, Defendant has failed to inform the Plaintiff and the Class of the root cause of the Defect. The omitted and concealed facts were material because a reasonable person would find them important in purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and the Class.

21.     Defendant actively concealed or suppressed these material facts, in whole or in part, to maintain a market for their vehicles, to protect profits, and to avoid recalls that would hurt the brand's reputation and have significant costs. It did so at the expense of Plaintiff and the Class. Had they been aware of the Piston Defect in the Class Vehicles, and Defendant's callous disregard for safety, Plaintiff and the Class either would not have paid as much as they did for their Class Vehicles, or they would not have purchased or leased them.

22.     Accordingly, Defendant is liable to Plaintiff and the Class for damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

23.     Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of Plaintiff's and the Class's rights and well-being; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT III
## NEGLIGENT MISREPRESENTATION

24.     Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

25.     Plaintiff asserts this Negligent Misrepresentation count on behalf of himself and on behalf of the Missouri Class.

26.    Defendant owed a duty to disclose the Piston Defect and its corresponding safety risk to Plaintiff and Class members because Defendant knew or should have known of the Defect and the risks associated with the engine's failure. Defendant also made partial disclosures regarding the safety of the Class Vehicles while Defendant either knew or should have known that the Class Vehicles possessed the Piston Defect and failed to disclose its existence and its corresponding safety hazard.

27.    Defendant negligently misrepresented and omitted material facts, in owners' manuals, maintenance schedules, or elsewhere, concerning the standard, quality, or grade of the Class Vehicles and the fact that the engine installed in the Class Vehicles is defective and prone to failure, exposing drivers and occupants to safety risks. Defendant misrepresented that it would remedy any defects under the express warranties but unconscionably temporarily limited coverage despite knowledge of the latent nature of the Defect. As a direct result of Defendant's negligent conduct, Plaintiff and Class members have suffered actual damages.

28.    The fact that the engine installed in the Class Vehicles is defective is material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. A complete engine failure means that drivers may be unable to control their vehicle. Drivers and occupants of the Class Vehicles, indeed the public at large, are at risk for collisions or other accidents which may directly result from failure of the engine. No reasonable consumer expects a vehicle to contain a dangerous safety defect, that can cause the engines to fail with no warning or time to take preventative measures.

29.    Plaintiff and Class members would not have purchased the Class Vehicles but for Defendant's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Piston Defect and corresponding safety risk, or would have paid less

for the Class Vehicles. Plaintiff and Class members justifiably relied upon Defendant's negligent false representations and omissions of material facts.

30.    As a direct and proximate result of Defendant's negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the Piston Defect, Plaintiff and Class members have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT IV
## UNJUST ENRICHMENT

31.    Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

32.    Plaintiff asserts this Unjust Enrichment count on behalf of himself and on behalf of the Missouri Class.

33.    Because of its conduct, Defendant caused damages to Plaintiff and Class members.

34.    Plaintiff and Class members conferred a benefit on the Defendant by overpaying for Class Vehicles at prices that were artificially inflated by Defendant's concealment of the Piston Defect and misrepresentations regarding the Class Vehicles' safety.

35.    As a result of Defendant's fraud and deception, Plaintiff and Class members were not aware of the facts concerning the Class Vehicles and did not benefit from the Defendant's misconduct.

36.    Defendant knowingly benefitted from its unjust conduct. Defendant sold and leased Class Vehicles equipped with a Piston Defect for more than what the vehicles were worth, at the expense of Plaintiff and Class members.

37.    Defendant readily accepted and retained these benefits from Plaintiff and Class members.

38.     It is inequitable and unconscionable for Defendant to retain these benefits because they misrepresented that the Class Vehicles were safe, and intentionally concealed, suppressed, and failed to disclose the Piston Defect to consumers. Defendant knowingly temporarily limited their warranty coverage and excluded the Piston Defect. Plaintiff and Class members would not have purchased or leased the Class Vehicles or paid less for it had Defendant not concealed the Piston Defect.

39.     Plaintiff and Class members do not have an adequate remedy at law.

40.     Equity cannot in good conscience permit the Defendant to retain the benefits that they derived from Plaintiff and Class members through unjust and unlawful acts, and therefore restitution or disgorgement of the amount of the Defendant's unjust enrichment is necessary.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment against Defendant, granting the following relief:

a.     An order certifying this case as a class action and appointing Plaintiff's counsel to represent the Class and Plaintiff as representative of the Class;

b.     All recoverable compensatory and other damages sustained by Plaintiff and the Class;

c.     Actual, treble, punitive, and/or statutory damages for injuries suffered by Plaintiff and the Class in the maximum amount permitted by applicable law;

d.     An order (1) requiring Defendant to immediately cease its wrongful conduct as set forth above; (2) enjoining Defendant from continuing to conceal material information about the Piston Defect of the Class Vehicles; and (3) requiring Defendant to refund to Plaintiff and all members of the Class the funds paid to Defendant for the Piston Defective Class Vehicles, and/or

repairs resulting from the Piston Defect;

  e.  Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

  f.  Such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

  Plaintiff demands a trial by jury on all causes of action so triable.

Dated:  June 23, 2022        Respectfully submitted,

                */s/ Michael J. Flannery*
                Michael J. Flannery, #52714MO
                CUNEO GILBERT &
                LADUCA, LLP
                500 North Broadway
                Suite 1450
                St. Louis, MO  63102
                P: 314-226-1015
                mflannery@cuneolaw.com

                Gary K. Burger, #32460MO
                BURGER LAW, LLC
                500 North Broadway
                Suite 1860
                St. Louis, MO  63102
                P: 314-542-2222
                gary@burgerlaw.com

                Charles J. LaDuca
                CUNEO GILBERT &
                LADUCA, LLP
                4725 Wisconsin Avenue, NW
                Suite 200
                Washington, DC  20016
                P: 202-789-3960
                charles@cuneolaw.com

                ***Counsel for Plaintiff and the Class***